# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

               Plaintiff-Appellee,

v

LEO DUWAYNE ACKLEY, also known as LEO
DUANE ACKLEY JR, also known as LEO
DUWAYNE ACKLEY, II,

               Defendant-Appellant.

UNPUBLISHED
August 2, 2018

No. 336063
Calhoun Circuit Court
LC No. 2011-003642-FC

---

Before: STEPHENS, P.J., and SHAPIRO and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals by right his convictions by a jury of first-degree child abuse, MCL 750.136b(2), and first-degree felony-murder, MCL 750.136(1)(b). Defendant's convictions arise out of the death of 3 ½ year-old "B", the younger of two daughters of defendant's girlfriend. The trial court sentenced him to life in prison for the murder conviction and 95 months to 180 months for the child abuse conviction. This matter was previously appealed to this Court in Docket No. 318303, which culminated in our Supreme Court granting defendant a new trial upon its finding that defendant had received ineffective assistance of counsel. *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015). In part because our Supreme Court's opinion was based on counsel's failure to obtain or consult an expert witness, a significant issue in the trial presently on appeal consisted of a pretrial *Daubert*[1] hearing. Defendant was re-tried and re-convicted of first-degree murder and child abuse. Defendant raises several arguments to the effect that he was deprived of a fair trial and of certain rights, and that the evidence did not support his convictions. We disagree, and we affirm.

Defendant was living with B's mother, who he was dating at the time, and B's 6-year-old sister. He cared for both girls while their mother was at work. According to the mother, B developed some health and behavior concerns when defendant moved in, including unexplained

---

[1] See *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993) and *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780 n 46; 685 NW2d 391 (2004).

-1-

bruising and regression in toilet training. Nevertheless, she testified that on the morning of July 28, 2011, B appeared to be in good health, alert, and talking. However, B had fallen from her bike and fallen from a trampoline a few days previously, which was not an uncommon occurrence. The previous day, B's temperature was approximately 100 degrees and she threw up during dinner.

When B's mother came home for lunch, defendant reported that B was upstairs not feeling well; according to the mother, B was apparently asleep but restless, with her head at the foot of the bed. B and her sister shared a room, and their beds were placed about a foot apart from one another. Defendant informed police officers that he discovered B on the floor, next to the bed, with her face down. He found her limp, so he initially tried to run water over her, but then drove her and her sister to his mother's house. He stated that he did not call 911 because he did not have a phone, but rather shared one with B's mother. Defendant's mother called 911 and initially decided to drive B to the hospital herself, but became too "shook up" to continue because B was foaming at the mouth.

When the EMTs and first responders arrived, B appeared to be breathing but was unresponsive and appeared to be unconscious. There appeared to be a bruise along the child's jawbone from the center toward the left. B was transferred to the pediatric ICU at the hospital, where she was pronounced brain dead the next morning. Witnesses testified to defendant appearing calm throughout the events. Defendant and B's mother drove home together. She testified that he said, "I'm going to prison" to her, and when she asked why, he replied with "They think I did something to our daughter."

Numerous doctors testified. Dr. Douglas McDonnell testified that B was unresponsive when she arrived and that her white blood cell count was abnormally high, which could result from infection, dehydration, or trauma. B had a subdural hematoma, cerebral edema, and suffered a hypoxic ischemic injury, leading to herniation of the brain, causing brain death. Dr. Joyce DeJong performed the autopsy and came to the conclusion that in her opinion the manner of death was homicide. Dr. DeJong based the opinion, in part on the fact that the child was asymptomatic for several days prior to her death and that it was more probable that the brain bleed resulted from a blow to the head which was consistent with an immediate onset of symptoms and death. In other words, the bleeding around the brain happened at the same time, because the bleeding would require a blow to the head and it would be exceptionally unusual for a child to sustain a lethal brain injury for several days without symptoms and then die.

Dr. Philip Ptacin, who had been B's doctor since early infancy, said she was anemic. B's test for thyroid problems were normal and he saw nothing that would cause concern and ultimately lead to her death. Dr. Stephen Guertin, who was qualified as an expert in the areas of child abuse, pediatrics, and pediatric intensive care, opined that B had suffered from abuse. Dr. Ljubisa Dragovic, who was qualified in the fields of forensic pathology and neuropathology, opined that the subdural hematoma B suffered did not occur on July 28 and was in fact a week old.

Defendant first argues that the trial court abused its discretion by allowing Dr. Rudolph Castellani to additionally testify regarding "abusive head trauma." We disagree.

"Under Michigan evidentiary law . . . the proponent of expert testimony must establish that the testimony is reliable by showing that it 'is based on sufficient facts or data,' that it 'is the product of reliable principles and methods,' and that the proposed expert witness 'has applied the principles and methods reliably to the facts of the case.'" *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008), quoting MRE 702 and citing *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993) and *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780 n 46; 685 NW2d 391 (2004). This "gatekeeping" role does not entail any attempt to determine whether the expert testimony is correct or undisputed, but rather only whether it is "rationally derived from a sound foundation" and is "based on the 'methods and procedures of science' rather than 'subjective belief or unsupported speculation.'" *Id*. at 217-218 (quotations and citations omitted). "[T]he determination of an expert's qualifications and the admissibility of this testimony is within the trial court's discretion." *Id*. at 216 (quotation omitted). An abuse of discretion occurs when a court's outcome falls outside of the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

The relevant tenets of the theory of abusive head trauma are that there is a high statistical correlation between certain kinds of hemorrhaging, in particular subdural and retinal, and "inflicted trauma" when presented in children under the age of two, something that Dr. Castellani contended was generally accepted in the scientific community and had no contrary studies. He also testified that a short-distance fall in children under the age of three was more correlated with abuse than with accidents. In contrast, defendant's expert, Dr. Dragovic, pointed out that there was a huge difference between the death of an infant and a toddler, and contended that there is no general empirically developed test that can determine whether a constellation of injuries represents intentional or accidental injury.

Defendant points out, accurately, that it is impossible to conduct any kind of actual experiment on children to determine what kind of intentional trauma will cause any given presented injury. Indeed, Dr. Castellani conceded that most of the supporting studies were case studies. However, while controlled experiments are the "gold standard" for scientific evidence, they are hardly the only source of valuable and reliable scientific data, including drawing statistical inferences from case studies, especially where some other evidence establishes at least part of the conclusions drawn therefrom. See *Chapin v A & L Parts, Inc*, 274 Mich App 122, 135-140; 732 NW2d 578 (2007) (DAVIS, J). There was ample testimony to the general effect that although abusive head trauma had encountered some doubt and skepticism in the scientific community, and it was not necessarily correctly predictive in every case, but that it remained backed by numerous studies and was not widely regarded as refuted.

Defendant's argument that a statistically predictive model can easily be wrong in any particular instance is well-taken. However, that does not make it unscientific, but rather appropriate for an argument to be made to the jury that they should be cautious about giving it much weight. Likewise with the fact that it was not universally well-regarded. The courts would do well to be suspicious of a theory widely deemed to be a "fringe" position or otherwise taken seriously only by an extreme minority of the relevant scientific community. However, many now-accepted theories began as minority views, so a lack of universal acceptance does not *per se* establish that it is unscientific or unsound. Scientific disputes should be resolved by scientists, not by lawyers. *Chapin*, 274 Mich App at 127. The trial court did not abuse its discretion by

concluding that abusive head trauma was supported by sufficiently sound principles and methodology to warrant its admission.

Defendant next argues that the trial court abused its discretion by permitting Dr. Guertin to testify as an expert in child abuse and that certain injuries of B's were indicative of abuse. We disagree.

Initially, although defendant objected to qualifying Dr. Guertin as an expert in child abuse, he did not object to Dr. Guertin's qualifications as an expert in the areas of pediatrics and pediatric intensive care. Additionally, defendant made no specific objections to any specific testimony taken from Dr. Guertin. To the extent defendant argues that Dr. Guertin was improperly qualified as an expert in child abuse, that issue is preserved; to the extent defendant argues that any *specific* testimony Dr. Guertin gave was improper, that issue is not preserved. See *People v Lundberg*, 364 Mich 596, 604; 111 NW2d 809 (1961). The trial court's determination of a witness's expert qualifications is reviewed for an abuse of discretion. *Unger*, 278 Mich App at 216. Ordinarily, the trial court's decision whether to admit evidence is also reviewed for an abuse of discretion, although any underlying questions of law are reviewed de novo. *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013). However, we review unpreserved allegations of error for plain error that either "resulted in the conviction of an actually innocent defendant" or "'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (quotation omitted).

As an initial matter, while Dr. Guertin was not a forensic pathologist, it defies sense to conclude that a doctor with extensive experience treating trauma victims would lack insight into what kinds of traumas tend to lead to what kinds of injuries. Expertise in pediatric intensive care inescapably has considerable crossover into the medical treatment portion of expertise in child abuse. Dr. Guertin was the Director of the Children's Center at Sparrow Hospital, Director of the Pediatric Intensive Care Unit, and a physician member of Child Safety Program. He is also a member of two Child Death Review teams from both Eaton and Ingham County for almost twenty years. He sees about two hundred to two hundred fifty children a year who are referred because of the possibility of abuse or neglect, and he is a practicing physician who sees actual patients. He testified that he attended autopsies and performed death reviews. Clearly, Dr. Guertin did not need to be qualified as an expert in child abuse to be able to render expert testimony concerning the genesis of certain injuries.

The relevant portion of Dr. Guertin's testimony was:

> She had bleeding around the outside of her brain but inside her skull. She also actually had a little bit of blood inside the hollow spaces inside your brain, called ventricles. She had a massively swollen brain, so that is likely ultimately what killed her. But she had not only the bleeding around her brain, but she had florid bleeding in the backs of her eyes. Florid bleeding in the backs of your eyes, in association with bleeding in the backs of your eyes, in association with bleeding in the backs of your eyes, in association with bleeding around your brain, in a circumstance where there's no reasonable explanation offered for that

is 100% specific for abuse. And in this particular case, that combination of severe bleeding in the back of your eyes with a subdural hemorrhage, is classic for abuse.

Furthermore, when directly asked by defense counsel whether the bruising gave any indication of who caused it, Dr. Guertin replied that it does not.

We think the distinction may be seemingly subtle, but there is a critical difference between stating that a child was abused, and stating that medical examination findings were highly consistent with abuse in the absence of some other "reasonable explanation." Defendant's theory of the case is that there *was* some other reasonable explanation. Dr. Guertin expressly disclaimed knowledge of who or what specifically caused B's injuries. Defendant correctly states that a witness cannot render an opinion as to a defendant's culpability, but witnesses are perfectly permitted to render opinions from which the jury may easily "connect the dots" to determine that the defendant is guilty. See *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013). Indeed, it would potentially be inadmissibly irrelevant if a witness's testimony did not have some bearing on the defendant's guilt or innocence. Dr. Guertin's testimony here, while clearly unfavorable, did not cross the line. Likewise, we find no merit to defendant's contention that Dr. Guertin "Dr. Guertin did not disclose how he came to the conclusions that he reached, except to possibly suggest that they were based on his clinical experience." His clinical experience would be sufficient under the circumstances. In the absence of an objection, we find no plain error affecting defendant's substantial rights.

Defendant next argues that he was deprived of a fair trial by the trial court's improper admission of testimony from B's mother that, at the end of their drive home together from the hospital, defendant said "I'm going to prison," because, he explained upon inquiry, "They think I did something to our daughter." We disagree.

Defendant asserts first that his statement, repeated by B's mother, should not have been admitted as an exception to the hearsay evidence rule under MRE 801(d)(2) because it "was not a statement of consciousness of guilt." Nothing in the text of MRE 801(d)(2) conditions admissibility of a statement by a party on it having any bearing on guilt at all. Apparently, defendant derives this argument from *People v Schaw,* 288 Mich App 231, 236-238; 791 NW2d 743 (2010), in which this Court approved of the admissibility of a statement by the defendant because it "showed consciousness of guilt." The analysis in that case, however, was in the context of the statement's *relevance* under MRE 401; its admissibility under MRE 801(d)(2) was independent and essentially assumed because, obviously, it was "the party's own statement." MRE 801(d)(2)(A). Defendant's statement is obviously admissible as an exception to the hearsay evidence rule.

Less obvious is whether it is *also* admissible under MRE 401, 402, and 403, which, together, require evidence to have some bearing on a fact at issue and permit it to be excluded anyway if it poses a danger of unfair prejudice or confusion that substantially outweighs its probative value. Defendant's contention that the statement was irrelevant because it was not an outright statement of guilt does not follow: while the trial court correctly held that the statement was open to some interpretation, it certainly *could* be perceived as consciousness of guilt and thus would make a fact at issue more likely under MRE 401 and 402. While the fact that it could be taken in multiple ways also suggests that there is some danger of confusion or unfair

prejudice, defendant simply does not make a persuasive case that that danger *substantially* outweighs its probative value. We are not persuaded that the trial court abused its discretion.

The remaining issues defendant raises himself in a Standard 4[2] brief. He first argues that he specifically told his trial counsel that he wished to testify on his own behalf at trial, but that trial counsel never discussed doing so with him and did not call him as a witness; he further contends that the trial court never asked defendant if he wished to testify and improperly concluded that he had been afforded "every opportunity" to do so. Although "every opportunity" might be a slight exaggeration, we find no error.

Even presuming this issue was preserved, denial of a right to testify, while of constitutional magnitude, is not considered a structural error so profound that it automatically requires reversal, but rather is subject to harmless-error analysis. *People v Solomon*, 220 Mich App 527, 535-537; 560 NW2d 651 (1996). If preserved, the beneficiary of the error must show that it is harmless beyond a reasonable doubt, and if unpreserved, the defendant must establish that he "is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Carines*, 460 Mich at 774.

The trial court is not required to obtain "an on-the-record waiver of a defendant's right to testify" or to advise a defendant of that right or establish that it was properly waived. *People v Harris*, 190 Mich App 652, 661-662; 476 NW2d 767 (1991). Defendant does not make any argument articulating how his testimony would have helped or how the absence thereof harmed him; furthermore, the trial court properly instructed the jury not to place any weight on the absence of defendant's testimony. Presuming he would have given testimony generally consistent with his testimony from his previous trial, the gravamen would have been that he did not know what was wrong with B. In any event, defendant's claim that he did not know of his right to testify because counsel did not advise him thereof is inconsistent with his testimony in the prior trial. It does not appear obvious that the outcome of the proceedings turned on the presence or absence of his testimony. Therefore, no error occurred.

Defendant next enumerates nine statements the prosecutor made to the jury that allegedly constitute some manner of falsehood, misrepresentation, or other impropriety. Defendant did not object to any of the alleged improper statements by the prosecutor or request curative instructions, nor does defendant contend that curative instructions could not have purged the taint of any such improprieties, so this issue is unpreserved. *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). We simply fail to comprehend defendant's reasoning, if any. Defendant presents the statements in a hyperbolic manner and makes no apparent effort to explain how or why they are supposedly contradicted by the cherry-picked piecemeal excerpts from the testimony defendant also enumerates. Several of the allegedly improper statements are simply nonsensical as defendant presents them. Others appear to be nothing more than the prosecutor's negative characterization of defendant or of the testimony. The remainder appears to be an assertion that the prosecutor omitted a complete recitation of other evidence that favored defendant.

---

[2] Administrative Order 2004-6.

In the absence of a coherent presentation of the reasoning by which defendant draws his conclusions from his presented facts, this Court generally declines to "discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Failing to articulate an argument in a coherent and understandable manner constitutes abandonment: a party may not simply heap an accumulation of points of data upon the courts and expect the courts to prognosticate the party's desired logic or thought processes. *Id*. Otherwise, the prosecutor is not obligated to "confine argument to the blandest possible terms" and is free to draw inferences from the evidence beyond merely regurgitating it. *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). This issue is either abandoned or meritless.

Defendant next argues that Officer Brett Weiss improperly provided expert testimony as a Forensic Lab Supervisor despite not having been qualified to do so. However, it is clear that Officer Weiss testified as a fact witness and did not provide anything resembling expert testimony. The only time he even suggested that he was any kind of expert was "in marijuana testing," which is of no relevance to this matter. Otherwise, he only described his collection of evidence. There is no conceivable abuse of discretion simply because the trial court permitted someone who could, possibly, be qualified as an expert to provide lay testimony as a lay witness.

Defendant next asserts seven reasons why defense counsel was allegedly ineffective, most of which are rendered irrelevant by issues of which we have already disposed. Of the remaining reasons, defendant argues that counsel should have interviewed B's sister and any number of unidentified neighbors. Defendant correctly points out that we do not know to what they might have testified, but as a consequence, his argument that their testimony might have helped him is purely speculative. "To warrant reversal, the prejudice shown must be actual, not merely speculative." *People v Fowlkes*, 130 Mich App 828, 836; 345 NW2d 629 (1983). Likewise, he asserts that defense counsel should have subpoenaed a doctor who testified at the *Daubert* hearing favorably to the defense, but fails to articulate of what the favorable testimony consists. Finally, he argues that trial counsel should have impeached an unidentified witness with an allegedly inconsistent statement made at the prior trial that we presume is found somewhere within the excerpt therefrom that defendant provides. Again, with no coherent explanation of essentially any of the relevant particulars, this argument is abandoned. *Mitcham*, 355 Mich at 203. Consequently, defendant has completely failed to show any mistake made by counsel or that any such mistake would have had any bearing on the outcome.

Defendant next argues that the evidence was insufficient to sustain his conviction, because the only fact actually proved was that B died of head trauma, whereas the issues of where or when the trauma occurred, how it was inflicted and by whom, were speculative. We disagree.

It does not appear that defendant raised this issue before the trial court, but a claim that the evidence is insufficient may, in a criminal matter, be addressed for the first time by an appellate court. *People v Patterson*, 428 Mich 502, 514-515; 410 NW2d 733 (1987). "Taking the evidence in the light most favorable to the prosecution, the question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002). This includes both direct and

circumstantial evidence, and any reasonable inferences therefrom must be drawn in favor of the prosecution; it does not require the prosecution "to negate every reasonable theory consistent with a defendant's innocence." *Id*. at 428-430.

The jury is not permitted to speculate, but it is tasked with deciding what individual pieces of evidence and reasonable inferences therefrom to believe. *People v Howard*, 50 Mich 239, 242-243; 15 NW 101 (1883); *People v Bailey*, 451 Mich 657, 673-675, 681-682; 549 NW2d 325 (1996). Defendant's argument that there is only speculative evidence of how, when, where, or why B sustained her injuries is incorrect. Rather, no eyewitness to the infliction of those injuries testified. However, none is required. There was evidence tending to show that her injuries must have occurred while under defendant's care and that they were intentionally inflicted by another person rather than accidentally sustained, making their infliction by defendant a reasonable inference. There was also evidence tending to show that B began suffering other health or behavioral problems when defendant moved in. Finally, there was evidence from which it could be inferred that defendant displayed an inappropriate level of unconcern with B's unresponsiveness. The fact that some inferences may be required to uphold defendant's conviction does not mean the jury's conclusion was speculative.

Defendant finally argues that even if no individual error was of such magnitude to require a new trial, he was deprived of a fair trial by the accumulation thereof. A claim of cumulative error is reviewed to determine whether defendant was denied a fair trial as a consequence of the alleged errors. *People v Brown*, 279 Mich App 116, 145; 755 NW2d 664 (2008). "But only 'actual errors' are aggregated when reviewing a cumulative-error argument." *People v Gaines*, 306 Mich App 289, 310; 856 NW2d 222 (2014). As discussed, either no errors occurred or they were harmless. For errors to accumulate, they must have *some* unfairly prejudicial consequence, even if not enough to warrant reversal alone. Defendant has not shown *any* unfair prejudice from any errors, so there is no possibility of cumulative error warranting reversal.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Douglas B. Shapiro
/s/ Amy Ronayne Krause

-8-